

ORIGINAL

1   Anthony M. Keats (SBN 123672)
    *akeats@stubbsalderton.com*
2   Konrad K. Gatien (SBN 221770)
    *kgatien@stubbsalderton.com*
3   Vivian S. Lee (SBN 273274)
    *vlee@stubbsalderton.com*
4   STUBBS ALDERTON & MARKILES, LLP
    1453 3rd St. Promenade, Suite 300
5   Santa Monica, California 90401
    Telephone:    (310) 746-9800
6   Facsimile:    (310) 746-9820

7   Attorneys for Plaintiffs
    LOUIS VUITTON MALLETIER, S.A.,
8   CÉLINE, S.A., and CHRISTIAN DIOR, S.A.

9

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION



13   LOUIS VUITTON MALLETIER, S.A., a *société*
     *anonyme* duly organized and existing under the
14   laws of France; CÉLINE, S.A., a *société*
     *anonyme* duly organized and existing under the
15   laws of France; and CHRISTIAN DIOR, S.A., a
     *société anonyme* duly organized and existing
16   under the laws of France;

17                     Plaintiffs,

18        v.

19   GLAMORA BY SADIA, an unknown business
20   entity; SADIA BARRAMEDA, an individual;
     and JOHN DOES 1 to 10, inclusive,
21
22                     Defendants.
23
24
25
26
27
28

Case No. CV 14 5421

**DOCUMENT FILED UNDER SEAL**

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFFS' *EX PARTE*
APPLICATION FOR:

1.  **TEMPORARY RESTRAINING
    ORDER;**
2.  **SEIZURE ORDER;**
3.  **ORDER TO SHOW CAUSE RE
    PRELIMINARY INJUNCTION;**
4.  **TEMPORARY RESTRAINING
    ORDER TO FREEZE
    DEFENDANTS' ASSETS
    PENDING A DETERMINATION
    OF LIABILITY AND DAMAGES;
    AND**
5.  **EXPEDITED DISCOVERY.**

SEALED
BY COURT ORDER

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

---

MEMO OF POINTS AND AUTHORITIES ISO PLS.' *EX PARTE* APP'N RE TRO; SEIZURE ORDER;
OSC RE PI; TRO RE ASSET FREEZE; AND EXPEDITED DISC.

ORIGINAL



1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

I. INTRODUCTION ............................................................................................................. 1

4

II. STATEMENT OF FACTS ............................................................................................... 3

5

    A.  Plaintiffs' Histories and Intellectual Property Rights ............................................. 3

6

          1.  Louis Vuitton and Louis Vuitton's Trademarks and Copyrights ........................... 3

7

          2.  Céline and the Céline Trademarks ...................................................................... 4

8

          3.  Christian Dior and the Dior Trademarks .............................................................. 4

9

    B.  Defendants and Their Infringing Acts ................................................................... 5

10

III.  LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER ................................. 7

11

IV.  DEFENDANTS SHOULD BE TEMPORARILY AND PRELIMINARY
RESTRAINED FROM COUNTERFEITING AND INFRINGING PLAINTIFFS'

12

TRADEMARKS AND OTHERWISE ENGAGING IN UNFAIR COMPETITION ............. 8

13

    A.  Likelihood of Success on the Merits ...................................................................... 8

14

          1.  Strength of the Marks ......................................................................................... 9

15

          2.  Proximity of the Goods ..................................................................................... 10

16

          3.  Similarity of the Marks ...................................................................................... 10

17

          4.  Evidence of Actual Confusion ........................................................................... 10

18

          5.  Marketing Channels Used ................................................................................. 10

19

          6.  Types of Goods and Degree of Care Likely To Be Exercised ............................. 11

20

          7.  Defendants' Intent in Selecting the Marks ......................................................... 11

21

          8.  Likelihood of Expansion of Product Lines .......................................................... 12

22

    B.  Likelihood of Irreparable Harm ........................................................................... 12

23

    C.  The Balance of Hardships Favors Plaintiffs ......................................................... 13

24

    D.  An Injunction is in the Public Interest .................................................................. 14

25

V.  DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND
PRELIMINARILY ENJOINED FROM DILUTING PLAINTIFFS'

26

TRADEMARKS .............................................................................................................. 14

27

    A.  Likelihood of Success on the Merits .................................................................... 15

28

    B.  Likelihood of Irreparable Harm & Balance of Hardships ...................................... 16

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

i

C. An Injunction is in the Public Interest ............................................................... 16

VI. DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND
PRELIMINARILY ENJOINED FROM INFRINGING PLAINTIFF LOUIS
VUITTON'S COPYRIGHTS ..................................................................................... 16

A. Likelihood of Success on the Merits................................................................. 16

B. Likelihood of Irreparable Harm ........................................................................ 17

C. Balance of Hardships ........................................................................................ 17

D. An Injunction is in the Public Interest ............................................................. 17

VII. THE COURT SHOULD AUTHORIZE A SEIZURE OF DEFENDANTS'
COUNTERFEIT GOODS AND RECORDS PERTAINING THERETO
PURSUANT TO 15 U.S.C. § 1116(d)(1)(A) ............................................................. 18

VIII. DEFENDANTS' ASSETS SHOULD BE RESTRAINED PENDING A
DETERMINATION OF LIABILITY AND DAMAGES ........................................ 20

A. Legal Authority to Issue an *Ex Parte* Temporary Restraining Order Freezing
Defendants' Assets ............................................................................................ 20

B. The Asset Freeze Should Be Issued Without Notice ........................................ 20

C. Plaintiffs Meet the Standard for a Temporary Asset Restraining Order ........... 21

    1. Plaintiffs Will Suffer Irreparable Harm if an Asset Freeze is Not Ordered ......... 21

    2. The Balance of Hardships Favors Plaintiffs ................................................ 22

    3. The Public Interest Will Be Served by Granting an Asset Freeze...................... 23

IX. LIMITED EXPEDITED DISCOVERY IS WARRANTED......................................... 23

X. BOND ........................................................................................................................ 24

XI. CONCLUSION ........................................................................................................... 24

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A&M Records, Inc. v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. 2001) ................................................................. 16

*Accuride Int'l, Inc. v. Accuride Corp.,*
871 F.2d 1531 (9th Cir. 1989) ................................................................... 9

*Alliance for Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ............................................................... 7, 8

*American Home Products Corp. v. Johnson Chemical Co.,*
589 F.2d 103 (2d Cir. 1978) ...................................................................... 9

*AMF Inc. v. Sleekcraft Boats,*
599 F.2d 341 (9th Cir. 1979) ......................................................... 8, 10, 11

*Apple Computer, Inc. v. Franklin Computer Corp.,*
714 F.2d 1240 (3rd Cir. 1983) ................................................................ 18

*Avery Dennison Corp. v. Sumpton,*
189 F.3d 868 (9th Cir. 1999) .................................................................. 15

*Brookfield Comms., Inc. v. West Coast Entm't,*
174 F.3d 1036 (9th Cir. 1999) ............................................................ 8, 11

*Cadence Design Systems, Inc. v. Avant! Corp.,*
125 F.3d 824 (9th Cir. 1997) .................................................................. 17

*Cytosport, Inc. v. Vital Pharmaceuticals, Inc.,*
617 F. Supp. 2d 1051 (E.D. Cal. 2009) ........................................ 8, 13, 14, 23

*Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.,*
2014 WL 4679001 (C.D. Cal. Sept. 18, 2014) ........................................ 12

*Deere & Co. v. MTD Prods., Inc.,*
41 F.3d 39 (2nd Cir. 1994) ...................................................................... 16

*DSC Comms. Corp. v. DGI Techs., Inc.,*
898 F. Supp. 1183 (N.D. Tex. 1995) ....................................................... 22

*Eclipse Assoc. v. Data General Corp.,*
894 F.2d 1114 (9th Cir. 1990) ................................................................ 10

*F.T. Int'l Ltd. v. Mason,*
2000 WL 1514881 (E.D. Pa. Oct. 11, 2000) ........................................... 21

*Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen,*
548 F. Supp. 248 (S.D. Fla. 1982) .......................................................... 23

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

iii

*Gilliam v. American Broadcasting Cos.*,
    538 F.2d 14 (2d Cir. 1976) ........................................................................... 13

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ..................................................................... 10

*Gucci Am., Inc. v. Wang Huoqing*,
    2011 WL 31191 (N.D. Cal. Jan. 3, 2011) ................................................... 10

*Helene Curtis Indus., Inc. v. Church & Dwight Co.*,
    560 F.2d 1325 (7th Cir. 1977) ..................................................................... 14

*Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ..................................................................... 12

*Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.*,
    2013 WL 3622016 (N.D. Cal. July 12, 2013) ............................................. 21

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
    4 F.3d 819 (9th Cir. 1993) ........................................................................... 17

*Interplay Entm't Corp. v. TopWare Interactive, Inc.*,
    751 F. Supp. 2d 1132 (C.D. Cal. 2010) ........................................................ 9

*Interstellar Starship Serv. Ltd. v. Epix, Inc.*,
    184 F.3d 1107 (9th Cir. 1999) ..................................................................... 11

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008) ......................................................................... 8

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ..................................................................... 21

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ....................................................................... 24

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
    51 F.3d 982 (11th Cir. 1995) ....................................................................... 20

*M2 Software, Inc. v. Madacy Entm't*,
    421 F.3d 1073 (9th Cir. 2005) ....................................................................... 8

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002) ....................................................................... 16

*Moroccanoil, Inc. v. Moroccan Gold, LLC*,
    590 F. Supp. 2d 1271 (C.D. Cal. 2008) ....................................................... 13

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) ..................................................................... 10

*Nova Wines, Inc. v. Adler Fels Winery, LLC*,
    467 F. Supp. 2d 965 (N.D. Cal. 2006) ........................................................ 12

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

iv

*Official Airline Guides, Inc. v. Goss,*
    6 F.3d 1385 (9th Cir. 1993) ..................................................................... 11

*Panavision Int'l, L.P. v. Toeppen,*
    141 F.3d 1316 (9th Cir. 1998) ................................................................... 15

*Perfumebay.com Inc. v. eBay, Inc.,*
    506 F.3d 1165 (9th Cir. 2007) ................................................................... 14

*Phillip Morris USA Inc. v. Shalabi,*
    352 F. Supp. 2d 1067 (C.D. Cal. 2004) ...................................................... 9

*Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.,*
    354 F.3d 1020 (9th Cir. 2004) ................................................................... 11

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.,*
    970 F.2d 552 (9th Cir. 1992) ............................................................... 20, 23

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,*
    944 F.2d 597 (9th Cir. 1991) ..................................................................... 12

*Semitool, Inc. v. Tokyo Electron Am., Inc.,*
    208 F.R.D. 273 (N.D. Cal. 2002) ............................................................... 23

*Stork Res. v. Sahati,*
    166 F.2d 348 (9th Cir. 1948) ..................................................................... 11

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,*
    240 F.3d 832 (9th Cir. 2001) ....................................................................... 7

*Time Warner Enter. Co., L.P. v. Does Nos. 1-2,*
    876 F. Supp. 407 (E.D.N.Y. 1994) ............................................................ 21

*Tommy Hilfiger Licensing, Inc. v. Nautical Apparel, Inc.,*
    924 F. Supp. 17 (S.D.N.Y. 1996) .............................................................. 19

*U.S. ex rel. Vuitton S.A. v. Karent Bag, Inc.,*
    592 F. Supp. 734 (S.D.N.Y. 1984), *aff'd*, 780 F.2d 179 (2nd Cir. 1985), *rev'd on other grounds*, 481 U.S. 787 (1987) ......................................................... 22

*U.S. v. Petrosian,*
    126 F.3d 1232 (9th Cir. 1997) ..................................................................... 9

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ........................... 7, 13

**Statutes**

15 U.S.C. § 1116(a) .......................................................................................... 20

15 U.S.C. § 1116(d) .......................................................................................... 18

15 U.S.C. § 1116(d)(10)(B) .............................................................................. 23

15 U.S.C. § 1116(d)(4)(B) ................................................................................ 18

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

v

15 U.S.C. § 1125(c)(2)(A) ........................................................................................ 15

15 U.S.C. § 1127 ...................................................................................................... 9

17 U.S.C. § 410(c) .................................................................................................. 17

17 U.S.C. § 501 ...................................................................................................... 16

18 U.S.C. § 2320 .................................................................................................... 19

Cal. Bus. & Prof. Code § 14247(a) .......................................................................... 15

Cal. Bus. & Prof. Code § 14247(a)(1)-(4) ............................................................... 15

**Other Authorities**

S. Rep. No. 98-526, 98th Cong., 2d Sess. 5 (1984), reprinted in U.S.C.C.A.N. 3627, 3631 ............ 18

Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130
    Cong. Rec. H12076, at 12080 (Oct. 10, 1984) ............................................... 18

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

MEMO OF POINTS AND AUTHORITIES ISO PLS.' *EX PARTE* APP'N RE TRO; SEIZURE ORDER;
OSC RE PI; TRO RE ASSET FREEZE; AND EXPEDITED DISC.

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

## I.  **INTRODUCTION**

Plaintiffs Louis Vuitton Malletier ("Louis Vuitton"), Céline, S.A. ("Céline"), and Christian Dior, S.A. ("Dior"), (collectively, "Plaintiffs"), are companies within the LVMH Fashion Group. Plaintiffs are seeking, pursuant to federal trademark and copyright law, as well as state and common law, (1) a temporary restraining order, (2) a seizure order, (3) an order to show cause re preliminary injunction, (4) a temporary restraining order to freeze defendants' assets pending a determination of liability and damages, and (5) expedited discovery as a result of defendants' sophisticated acts of distribution and sale of merchandise bearing counterfeits and infringements of Plaintiffs' famous trademarks and copyrights.

Plaintiffs are suing defendant Sadia Barrameda ("Barrameda"), the moving force behind the defendant Glamora by Sadia ("Glamora"), (collectively, "Defendants"), for federal trademark counterfeiting and infringement, copyright infringement, false designation of origin, federal and state dilution, and unfair competition. This suit arises out of Defendants' fraudulent advertising, distribution, offering for sale, and sale of handbags and fashion accessories (the "Counterfeit and/or Infringing Goods" or "Defendants' Infringing Goods") bearing spurious marks, which are identical or substantially indistinguishable copies of Plaintiffs' federally registered trademarks, including the Louis Vuitton Trademarks, Céline Trademarks, and Dior Trademarks, (collectively, "Plaintiffs' Trademarks"), and the Louis Vuitton Copyrighted Prints, (collectively, "Plaintiffs' Intellectual Property"). Specifically, Defendants are using counterfeit and/or infringing copies of Plaintiffs' Intellectual Property in connection with the advertising, distribution, offering for sale, and sale of handbags and accessories.

This is not the typical counterfeit case where swap meet vendors sell counterfeits of famous marks at very low prices. Rather in a more blatant effort to rip-off consumers, Defendants are charging thousands of dollars for fake merchandise. This is the most egregious type of counterfeiting scheme. Barrameda is an actual customer of the San Francisco Louis Vuitton boutique, and thus has knowledge regarding Louis Vuitton's genuine products and trademarks. She cleverly prices the bogus merchandise she sells at her shop at several hundreds or thousands of dollars in an effort to convince her well-heeled customers that she is offering them genuine

1

MEMO OF POINTS AND AUTHORITIES ISO PLS.' *EX PARTE* APP'N RE TRO; SEIZURE ORDER;
OSC RE PI; TRO RE ASSET FREEZE; AND EXPEDITED DISC.

1  merchandise, but at a discount.

2      As set forth in the supporting declarations, Plaintiffs have been investigating the activities of

3  Defendants since 2012. In August of 2012, Defendants were put on notice of their counterfeiting

4  activities. In response, Barrameda refused to surrender the Counterfeit and/or Infringing Goods, and

5  instead contacted the San Francisco boutique of Louis Vuitton to complain that she was selling only

6  genuine goods. However, Defendants' counterfeit sales are continuing at present.

7      Barrameda has publicized that she is a member or descendant of a royal Filipino family.

8  Further, Plaintiffs learned that Barrameda recently purchased shares of "penny" stock in a cannabis

9  product company with a purported value of $3,675,416. Due to Barrameda's sophistication, her ties

10  to the Philippines, and her apparent ability to tap large amounts of money in cannabis, Plaintiffs not

11  only seek expedited discovery but to freeze Defendants' assets until there is a determination on

12  Defendants' liability and the status of the proceeds from Defendants' counterfeit sales. Otherwise,

13  like most counterfeiters, documentation and monetary proceeds are difficult to locate once the

14  counterfeiter knows a restraining order has been issued.

15      Upon consideration of the Complaint and the sworn declarations of John Maltbie ("Maltbie

16  Decl."), Kris Buckner ("Buckner Decl."), and Anthony M. Keats ("Keats Decl.") filed herewith, it

17  is apparent that Defendants' activities constitute willful counterfeiting and/or infringement of

18  Plaintiffs' Intellectual Property in total disregard of Plaintiffs' rights and have taken place in spite of

19  Defendants' knowledge that their use of Plaintiffs' Intellectual Property was and is in direct

20  contravention of Plaintiffs' rights. Defendants' unlawful activities have caused and will continue to

21  cause irreparable injury to Plaintiffs as: (1) Defendants have defrauded the public into thinking that

22  the Counterfeit and/or Infringing Goods are valuable, authorized products of Plaintiffs; (2) deprived

23  Plaintiffs of their respective rights to determine the manner in which Plaintiffs' Intellectual Property

24  are presented to the public through merchandising; (3) deceived the public as to the origin,

25  sponsorship, and/or association of the Counterfeit and/or Infringing Goods; and (4) and wrongfully

26  traded and capitalized on Plaintiffs' reputation and goodwill and the commercial value of the

27  Plaintiffs' Intellectual Property. Here, if Defendants' Counterfeit and/or Infringing Goods are not

28  seized *ex parte*, Plaintiffs will be irreparably injured and will have lost an opportunity to stop this

2

MEMO OF POINTS AND AUTHORITIES ISO PLS.' *EX PARTE* APP'N RE TRO; SEIZURE ORDER;
OSC RE PI; TRO RE ASSET FREEZE; AND EXPEDITED DISC.

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1   outrageous and sophisticated scheme and to stop the tide of counterfeit products from flooding the

2   market. Likewise, if Defendants are able to destroy documents and computer files as well as move

3   the ill-gotten financial gains from their counterfeiting offshore, Plaintiffs will again have suffered at

4   the hands of these unscrupulous merchants.

5   **II.   STATEMENT OF FACTS**

6       **A.   Plaintiffs' Histories and Intellectual Property Rights**

7       Plaintiffs Louis Vuitton, Céline, and Dior are high-end luxury goods companies that are

8   owned by LVMH Moët Hennessy Louis Vuitton S.A. ("LVMH"), which is headquartered in

9   France. (Maltbie Decl. ¶ 3.)

10          1.   Louis Vuitton and Louis Vuitton's Trademarks and Copyrights

11      Since its inception in 1854 in Paris, France, Louis Vuitton has expanded its line of high-end

12  luxury goods to produce leather goods, ready-to-wear fashion, shoes, watches, jewelry, sunglasses,

13  and books. (Maltbie Decl. ¶ 4.) Louis Vuitton is one of the largest manufacturers and distributors of

14  high-end handbags in the world in terms of the number of units sold, and one of the largest sellers

15  of high-end handbags in the United States, which are sold exclusively through Louis Vuitton stores

16  and the Louis Vuitton U.S. Website, available at http://us.louisvuitton.com/. (*Id.*, ¶¶ 4, 8.)

17      Louis Vuitton is the owner of famous registered trademarks including the LOUIS

18  VUITTON word mark, the "LV" design mark, the Toile Monogram design mark, the Damier design

19  mark, the S-Lock design mark, and the Flower design marks, (collectively, the "Louis Vuitton

20  Trademarks"), which are used in association with a variety of leather handbags and accessories.

21  (*Id.*, ¶¶ 5-6; Ex. 1.) These registrations are valid and subsisting and many have become

22  incontestable. (*Id.*) In addition, Louis Vuitton also owns copyrights to the Monogram Multicolor

23  print designs, which are registered with the U.S. Copyright Office (the "Louis Vuitton Copyrighted

24  Prints"). (*Id.*, ¶ 7; Ex. 2.)

25      Louis Vuitton is the exclusive distributor of goods bearing the Louis Vuitton Trademarks

26  and Copyrighted Prints in the United States, and these goods are not sold on sale or for a discount.

27  (*Id.*, ¶ 8.) Louis Vuitton has developed an outstanding reputation in connection with its Louis

28  Vuitton Trademarks because they identify a unique level of high quality products originating with

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1 | Louis Vuitton. (*Id.*, ¶ 9.) Louis Vuitton spends millions of dollars each year on extensive print,

2 | media, and trade advertising. (*Id.*, ¶ 10.)

3 |   2.   Céline and the Céline Trademarks

4 | Founded in 1945 and owned by LVMH since 1996, Céline is a modern luxury brand

5 | offering a collection of ready-to-wear clothing, leather goods, shoes, and accessories. (Maltbie Decl.

6 | ¶ 20.) Céline is the owner of its famous registered trademarks, including the CÉLINE word marks,

7 | (the "Céline Trademarks"), which are used in connection with Céline's luxury goods. (*Id.*, ¶¶ 21,

8 | 22; Ex. 3.) Both of the Céline Trademark Registrations are in full force and effect and have become

9 | incontestable. (*Id.*)

10 | Céline is the exclusive distributor of goods bearing the Céline Trademarks in the United

11 | States, Céline products are sold exclusively through Céline stores and select high-end department

12 | stores, and these goods are not sold on sale or for a discount. (*Id.*, ¶ 23.) Céline has developed an

13 | outstanding reputation in connection with its Céline Trademarks because they identify a unique

14 | level of high quality products originating with Céline. (*Id.*, ¶ 24.) Céline spends millions of dollars

15 | each year on extensive print, media and trade advertising. (*Id.*, ¶ 25.)

16 |   3.   Christian Dior and the Dior Trademarks

17 | Christian Dior is a luxury goods company that was founded in 1946 by the eponymous

18 | designer, Christian Dior. (Maltbie Decl. ¶ 35.) Today, Christian Dior has grown to produce a wide

19 | variety of luxury goods, including leather goods, haute couture fashion, ready-to-wear fashion,

20 | fashion accessories, footwear, jewelry, timepieces, fragrance, make-up, and skincare products for

21 | women, men, and babies. (*Id.*, ¶ 36.) Dior is the owner of its famous registered trademarks,

22 | including the CHRISTIAN DIOR and DIOR word and design marks, (collectively, the "Dior

23 | Trademarks"), which are used in connection with Dior's luxury goods. (*Id.*, ¶¶ 37, 38; Ex. 4.) The

24 | Dior Trademark Registrations are in full force and effect and many have become incontestable. (*Id.*)

25 | Dior is the exclusive distributor of Dior Trademarks in the United States, Dior products are

26 | sold exclusively through Dior stores and boutiques, and goods bearing the Dior Trademarks are not

27 | sold on sale or for a discount. (*Id.*, ¶ 39.) Dior has developed an outstanding reputation in

28 | connection with its Dior Trademarks because they identify a unique level of high quality products

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

MEMO OF POINTS AND AUTHORITIES ISO PLS.' *EX PARTE* APP'N RE TRO; SEIZURE ORDER;
OSC RE PI; TRO RE ASSET FREEZE; AND EXPEDITED DISC.

1  originating with Dior. (*Id.*, ¶ 40.) Dior spends millions of dollars each year on extensive print,
2  media and trade advertising. (*Id.*, ¶ 41.)

3      **B.   Defendants and Their Infringing Acts**

4      Long after Plaintiffs' adoption and use of the Plaintiffs' Intellectual Property, and long after
5  the registration of Plaintiffs' Trademarks and the Louis Vuitton Copyrighted Prints, Glamora by
6  Sadia, a retail store located at 2475 Sand Creek Road, Suite 112, Brentwood, California 94513,
7  commenced advertising, distributing, offering for sale, and selling merchandise bearing counterfeits
8  or infringements of Plaintiffs' Intellectual Property. (Compl. ¶ 35; Ex. 5; Keats Decl. ¶ 4.) Plaintiffs
9  are informed and believe that Barrameda is the owner of Glamora. (Compl. ¶ 10; Keats Decl. ¶ 10;
10 Ex. 3.)

11     Since 2012, Plaintiffs have investigated Defendants' sale of Counterfeit and/or Infringing
12 Goods bearing imitations or substantially similar copies of Plaintiffs' Intellectual Property. (Compl.
13 ¶ 35-36; Buckner Decl. ¶¶ 9-30; Maltbie Decl. ¶¶ 12-13, 14, 29, 45.) On nine separate occasions
14 between March, 2012 to October, 2014, Plaintiffs' investigators traveled to Glamora and observed
15 Defendants offering for sale, and selling handbags and accessories bearing trademarks, designs, and
16 prints identical or substantially indistinguishable to Plaintiffs' Intellectual Property. (Buckner Decl.
17 ¶¶ 9-30). During the visits, the investigators purchased the following Counterfeit and/or Infringing
18 Goods from Glamora: (1) a wallet bearing the Louis Vuitton Copyrighted Prints and Louis Vuitton
19 Trademarks; (2) a key chain of charms bearing the Louis Vuitton Trademarks; (3) one handbag
20 bearing the Louis Vuitton Trademarks; (4) one belt bearing the Louis Vuitton Trademarks; (5) a
21 wallet bearing the Louis Vuitton Trademarks, and specifically the Damier design; (6) two handbags
22 bearing the Céline Trademarks; and (7) a handbag bearing the Dior Trademarks. (*Id.*) Photographs
23 of Defendants' Counterfeit and/or Infringing Goods are attached as **Exhibit 5** to the Complaint.
24 (Compl. ¶ 35, Ex. 5.) Plaintiffs did not license or otherwise authorize Defendants to advertise,
25 distribute, offer for sale, or sell these goods. (Maltbie Decl. ¶¶ 16, 31, 47.)

26     In addition, during the investigatory visits, Barrameda and employees of Glamora have
27 issued statements that falsely assert that Defendants' goods were affiliated, connected, or associated
28 with Plaintiffs or originate from, or are sponsored or approved by Plaintiffs including: "They are all

STUBBS ALDERTON & MARKLES, LLP
14353 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

5

1   real handbags," " We [ ] have Céline bags," "We mainly have Louis Vuitton," "We have a Dior bag

2   that's like $2,000.00," "I get them from special sales or warehouses where the bags go that they

3   don't sell," and "Our whole store is an entire 30% off today." (Buckner Decl. ¶¶ 10, 12, 15, 16, 20,

4   22, 24, 27.)

5          Plaintiffs' investigators forwarded Defendants' Counterfeit and/or Infringing Goods

6   purchased from Glamora and bearing imitations or substantially similar copies of Plaintiffs'

7   Intellectual Property to Plaintiffs. (Maltbie Decl. ¶¶ 14, 29, 45.) Plaintiffs have reviewed the

8   Counterfeit and/or Infringing Goods, and have further concluded that they are not genuine goods

9   and that these goods are of a lower quality than the genuine luxury goods manufactured and sold by

10  Plaintiffs. (Maltbie Decl. ¶¶ 14, 15, 29, 30, 45, 46.) Notwithstanding their visual similarity to

11  consumers, Defendants' Counterfeit and/or Infringing Goods are substantially inferior in quality to

12  Plaintiffs' genuine goods for the following reasons:

| Defendants' Counterfeit Louis Vuitton Goods | Defendants' Counterfeit Céline Goods | Defendants' Counterfeit Dior Goods |
|---|---|---|
| a. The packaging is inconsistent with that of genuine Louis Vuitton products;<br>b. The care cards (enclosed with the applicable products) are inconsistent with that of genuine Louis Vuitton products;<br>c. The materials are inconsistent with that of genuine Louis Vuitton products;<br>d. The stitching is inconsistent with that of genuine Louis Vuitton products;<br>e. The dust bags are inconsistent with that of genuine Louis Vuitton products; and<br>f. The use/placement of the Louis Vuitton Trademarks are inconsistent with that of genuine Louis Vuitton products. | a. The colorways of the handbags are inconsistent with genuine Céline products;<br>b. The interiors of the handbags are inconsistent with genuine Céline products;<br>c. The stitching on the handbags are inconsistent with genuine Céline products;<br>d. The leather/materials are inconsistent with genuine Céline products;<br>e. The care cards and hangtags are inconsistent with genuine Céline products; and<br>f. The dust bags are inconsistent with genuine Céline products. | a. The leather/materials are inconsistent with genuine Dior products;<br>b. The interior is inconsistent with genuine Dior products;<br>c. The use/placement of the Dior Trademarks is inconsistent with genuine Dior products;<br>d. The hardware is inconsistent with genuine Dior products;<br>e. The packaging is inconsistent with genuine Dior products; and<br>f. The overall quality of the handbag is inconsistent with genuine Dior products. |

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1   (*Id.*, ¶¶ 17, 32, 48.) Moreover, Plaintiffs' genuine products are not sold for sale or for a discount,

2   but Defendants have sold and are continuing to sell the Counterfeit and/or Infringing Goods at a

3   discount from prices that are usually charged for Plaintiffs' genuine goods, further corrupting

4   consumer expectation concerning Plaintiffs' brands and goods. (*Id.*, ¶¶ 8, 13, 23, 39, 46.)

5       Due to the popularity of the Plaintiffs' luxury goods, products bearing infringements and/or

6   counterfeits of Plaintiffs' Intellectual Property are being manufactured, distributed, and sold

7   throughout the world. Plaintiffs have undertaken substantial efforts to prohibit such infringement

8   and counterfeits through investigations and service of cease-and-desist notices. (Maltbie Decl.,

9   ¶ 52.) Specifically, on August 13, 2012, Plaintiffs' investigators delivered a cease-and-desist notice

10  to Glamora and spoke to Barrameda over the telephone regarding the same. (Buckner Decl. ¶¶ 19-

11  20; Ex. 1.) Despite being told to cease-and-desist from advertising, distributing, offering for sale,

12  and selling the Counterfeit and/or Infringing Goods, Defendants continue to willfully do so.

13  (Maltbie Decl. ¶ 51.) In addition, when investigators prompted Barrameda to surrender the

14  Counterfeit and/or Infringing Goods, she refused. (Buckner Decl. ¶ 20.) Defendants' use of

15  Plaintiffs' Intellectual Property is without Plaintiffs' consent, is likely to cause confusion and

16  mistake in the minds of purchasers, and is likely to create a false impression that Defendants and/or

17  Defendants' goods are authorized, sponsored, or approved by Plaintiffs. (Maltbie Decl. ¶¶ 15, 16,

18  19, 30, 31, 34, 46, 47, 50.)

19  **III.   LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER**

20      The standards for granting a temporary restraining order and preliminary injunction are the

21  same. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839, fn.7 (9th Cir.

22  2001). To be granted a preliminary injunction, a plaintiff must demonstrate the following: (1)

23  likelihood of success on the merits; (2) likelihood of irreparable harm; (3) the balance of hardships

24  favors the plaintiff; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def.*

25  *Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). In the Ninth Circuit,

26  "the elements of the preliminary injunction test are balanced, so that a stronger showing of one

27  element may offset a weaker showing of another." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d

28  1127, 1131 (9th Cir. 2011). An injunction may be appropriate when a plaintiff raises serious

---

7

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1 questions going to the merits and demonstrates that the balance of hardships tips sharply toward the

2 plaintiff, assuming the other two elements of the preliminary injunction test are also met. *Id.* at

3 1132.

**IV. DEFENDANTS SHOULD BE TEMPORARILY AND PRELIMINARY RESTRAINED FROM COUNTERFEITING AND INFRINGING PLAINTIFFS' TRADEMARKS AND OTHERWISE ENGAGING IN UNFAIR COMPETITION**

**A. Likelihood of Success on the Merits**

7 "[T]o prevail on a trademark infringement claim under the Lanham Act, a plaintiff must

8 establish that the defendant is 'using a mark confusingly similar to a valid, protectable trademark'

9 of the plaintiff's." *Cytosport, Inc. v. Vital Pharmaceuticals, Inc.*, 617 F. Supp. 2d 1051, 1065 (E.D.

10 Cal. 2009) (quoting *Brookfield Comms., Inc. v. West Coast Entm't*, 174 F.3d 1036, 1046 (9th Cir.

11 1999)). The test for trademark infringement is the same under state, federal, and common law, (*see*

12 *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005)), as are the tests for false

13 designation of origin and common law and statutory unfair competition based on claim of

14 trademark infringement; specifically, whether there will be a likelihood of confusion. *Jada Toys,*

15 *Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008).

16 Trademark registrations "constitute *prima facie* evidence that plaintiff owns a valid and

17 protectable mark and has the exclusive right to use the registered mark in commerce on or in

18 connection with the goods or services specified in the registrations." *Cytosport*, 617 F. Supp. 2d at

19 1065. Here, Plaintiffs own federal registrations for all of Plaintiffs' Trademarks at issue in this

20 action, many of which are incontestable. (Maltbie Decl. ¶¶ 6, 22, 38; Exs. 1, 3-4.) Such registrations

21 are *prima facie* evidence that Plaintiffs' Trademarks are valid and protectable, and that Plaintiffs

22 own and have the exclusive right to use them.

23 Courts in the Ninth Circuit consider the following eight factors in determining whether there

24 is a likelihood of confusion between the plaintiff's and the defendant's goods: "(1) strength of the

25 mark; (2) proximity of the goods; (3) similarity of the marks; (4); evidence of actual confusion; (5)

26 marketing channels used; (6) type of goods and degree of care likely to be exercised by the

27 purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of

28 the product lines." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). "The inquiry

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1  may proceed in any order and a court need not address every factor." *Interplay Entm't Corp. v.*

2  *TopWare Interactive, Inc.*, 751 F. Supp. 2d 1132, 1136 (C.D. Cal. 2010).

3      "However, in cases involving counterfeit marks, it is unnecessary to perform the step-by-

4  step examination . . . because counterfeit marks are inherently confusing." *Phillip Morris USA Inc.*

5  *v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004) (internal citation and quotation marks

6  omitted). The Lanham Act defines a counterfeit mark as "a spurious mark which is identical with,

7  or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. "When a genuine

8  mark is affixed to a counterfeit product, it becomes a spurious mark. A 'spurious' mark is one that

9  is false or inauthentic." *U.S. v. Petrosian*, 126 F.3d 1232, 1234 (9th Cir. 1997). Here, the Plaintiffs'

10  Trademarks became spurious when they were placed on Defendants' Counterfeit and/or Infringing

11  Goods because the marks falsely indicated that Plaintiffs were the source of said handbags and

12  accessories, and falsely identified those goods as being manufactured by Plaintiffs, and thus,

13  authentic. Nevertheless, in an abundance of caution, Plaintiffs will address the likelihood of

14  confusion factors set forth in *Sleekcraft* in turn below.

15      1.   Strength of the Marks

16      Factors contributing to the strength of a mark include extensive advertising, length of

17  exclusive use, public recognition and uniqueness. *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d

18  1531, 1536 (9th Cir. 1989). Plaintiffs' Trademarks are very well known among the consuming

19  public for a variety of goods including, without limitation, the handbags and accessories at issue

20  here. Plaintiffs have expended large sums of money to popularize the Plaintiffs' Trademarks and the

21  high quality goods that bear them. The success of such advertising and the popularity of goods

22  bearing the Plaintiffs' Trademarks are illustrated by the resulting millions of dollars of sales of such

23  goods. (Maltbie Decl. ¶¶ 10, 25, 41.) Therefore, the Plaintiffs' Trademarks are strong.

24      Furthermore, the fact that the Plaintiffs' Trademarks are the subject of numerous federal

25  trademark registrations, besides creating a strong presumption of validity, stands as proof of the

26  strength of the marks. *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 106

27  (2d Cir. 1978). Accordingly, this factor favors a finding of likelihood of confusion.

28  ///

STUBBS ALDERTON & MARKILES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

2.      Proximity of the Goods

Defendants are selling the same type of goods, i.e., handbags and accessories, which look identical or substantially similar to Plaintiffs' genuine handbags and accessories. The fact that Defendants are selling same type of goods sold by Plaintiffs is one of the three most important factors to be considered in the likelihood of confusion analysis. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). This factor, therefore, supports a finding of likelihood of confusion.

3.      Similarity of the Marks

The Ninth Circuit has also expressly stated that similarity of the marks is another of the three most probative factors in the likelihood of confusion analysis. *GoTo.com*, 202 F.3d at 1205. In the instant case, Defendants are using marks, which are or almost identical to the Plaintiffs' Trademarks. Such fact supports a finding of likelihood of confusion.

4.      Evidence of Actual Confusion

Actual confusion is unnecessary to establish infringement since the test is likelihood of confusion. *Eclipse Assoc. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990). Indeed, the court in *Sleekcraft* held "[b]ecause of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive." *Sleekcraft*, 599 F.2d at 352. Further, the Ninth Circuit has stated that the importance of actual confusion "is diminished at the preliminary injunction stage of the proceedings." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011). A showing of actual confusion is not necessary to establish a likelihood of confusion. *Gucci Am., Inc. v. Wang Huoqing*, 2011 WL 31191, at *9 (N.D. Cal. Jan. 3, 2011). At this procedural juncture, Plaintiffs have yet to discover evidence of actual confusion. As a result, this factor should be given no weight at present.

5.      Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. Both Plaintiffs authentic handbags and accessories and Defendants' Counterfeit and/or Infringing Goods are advertised, distributed, offered for sale, and sold at retail stores in the same geographical distribution areas, including California, and specifically the San Francisco Bay Area.

1   Moreover, both target the same general customers with goods at similar price points, and thus,

2   Defendants' Counterfeit and/or Infringing Goods are competing directly with Plaintiffs' genuine

3   handbags and accessories. Thus, this factor favors a finding of likelihood of confusion.

4           6.     Types of Goods and Degree of Care Likely To Be Exercised

5         The standard used by courts in assessing likelihood of confusion of the public is not that of

6   an expert, but rather the "typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353.

7   "Low consumer care . . . increases the likelihood of confusion." *Playboy Enterprises, Inc. v.*

8   *Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). When reviewing this factor, the

9   most important consideration is generally price. *Brookfield*, 174 F.3d at 1060. Consumer confusion

10   is likely to occur from paying similar prices for counterfeit goods because consumers may

11   reasonably suspect that those goods have a common origin or that they are in some way related to

12   the genuine goods. Although consumers are generally expected to be more careful when selecting

13   goods at high prices, the law is nevertheless designed to protect the purchasing public, including

14   "the ignorant, the inexperienced, and the gullible." *Stork Res. v. Sahati*, 166 F.2d 348, 359 (9th Cir.

15   1948).

16         Here, the goods are handbags and accessories sold for use by consumers seeking luxury

17   brand name goods and accessories who are likely to exercise a high degree of care when purchasing

18   such items. Nevertheless, Defendants falsely assert to consumers that their Counterfeit and/or

19   Infringing Goods are real or authentic and sell their Counterfeit and/or Infringing Goods at similar

20   prices as Plaintiffs' genuine goods, further tricking consumers to believing they are purchasing

21   genuine goods, but at a discount. Accordingly, this factor weighs in favor of a finding of likelihood

22   of confusion.

23           7.     Defendants' Intent in Selecting the Marks

24         The Ninth Circuit has held that "[w]hen an alleged infringer knowingly adopts a Mark

25   similar to another's, courts will presume an intent to deceive the public." *Official Airline Guides,*

26   *Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993). In a case of clear-cut copying such as this, it is

27   appropriate to infer that the defendant intended to benefit from plaintiff's reputation, to the

28   detriment of plaintiff. *See Interstellar Starship Serv. Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1111 (9th

STUBBS ALDERTON & MARKILES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1  Cir. 1999) ("Adopting a designation with knowledge of its trademark status permits a presumption

2  of an intent to deceive . . . .") Here, Defendants obviously are advertising, distributing, offering for

3  sale, and selling goods bearing the Plaintiffs' Trademarks with the intent of reaping the benefits of

4  Plaintiffs' famous reputations and for the purpose of defrauding the consuming public. This factor,

5  therefore, supports a finding of likelihood of confusion.

6          8.     Likelihood of Expansion of Product Lines

7       Plaintiffs already distribute goods, which are virtually identical, except in quality, to those

8  being sold and offered for sale by Defendants. Since Defendants are already directly competing

9  with Plaintiffs by selling the aforementioned Counterfeit and/or Infringing Goods, analysis of this

10  factor is unnecessary. *See Nova Wines, Inc. v. Adler Fels Winery, LLC*, 467 F. Supp. 2d 965, 982

11  (N.D. Cal. 2006) (stating that "the expansion factor is irrelevant" because the plaintiff and

12  defendant were already competitors).

13       On balance, virtually every likelihood of confusion factor weighs in favor of Plaintiffs. As

14  such, Plaintiffs have proved that they are likely to succeed on the merits of their federal and state

15  trademark counterfeiting and/or infringement and unfair competition claims.

16      **B.**    **Likelihood of Irreparable Harm**

17       The likelihood of irreparable harm cannot be presumed from a showing of a likelihood of

18  success on the merits, but a plaintiff must demonstrate likely irreparable harm to obtain a

19  preliminary injunction in a trademark or copyright infringement action. *Herb Reed Enterprises,*

20  *LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). To do so, a plaintiff must

21  show that "remedies at law, such as monetary damages, are inadequate to compensate for the injury

22  arising" from a defendant's infringing use of the mark. *Id.* at 1249-50 (internal citation and

23  quotation marks omitted). In trademark cases, courts have found that intangible injuries such as the

24  loss of control of a business' reputation, a loss of trade, and damage to goodwill qualify as

25  irreparable harm. *See, e.g., Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,

26  944 F.2d 597, 603 (9th Cir. 1991); *Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*, 2014

27  WL 4679001, at *13 (C.D. Cal. Sept. 18, 2014) (analyzing the facts against *Herb Reed*, the court

28  noted that "Plaintiff has sufficiently alleged that it has suffered irreparable injury to its business

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1  goodwill and reputation due to Defendants' infringing activities and that, even after receiving a

2  statutory damages award, Plaintiff's injury will not be fully remedied by a monetary award . . . .").

3  As the *Cytosport* court aptly noted:

4        Trademarks serve as the identity of their owners and in them resides the
         reputation and goodwill of their owners. Thus, if another person infringes the
5        marks, that person borrows the owner's reputation, whose quality no longer
         lies within the owner's control. A trademark owner's loss of the ability to
6        control its marks, thus, creates the potential for damage to its reputation.
         Potential damage to reputation constitutes irreparable injury for the purpose of
7        granting a preliminary injunction in a trademark case.

8  *Cytosport*, 617 F. Supp. 2d at 1080 (internal citations and quotation marks omitted).

9         Here, the irreparable harm to Plaintiffs is demonstrated by the facts presented in the

10 declarations and Complaint filed herewith. (Maltbie Decl. ¶¶ 15, 18, 30, 33, 46, 49; Buckner Decl.

11 ¶¶ 9-30; Compl. ¶¶ 35-38.) Flooding the market with inferior products that infringe Plaintiffs'

12 Trademarks not only will result in loss of sales and control of Plaintiffs' rights, but will damage

13 Plaintiffs' reputation for producing, manufacturing, and distributing high quality luxury goods.

14 Further, Defendants' sale of Counterfeit and/or Infringing Goods at a discount or on sale corrupts

15 consumer expectation in believing that Plaintiffs' high quality luxury goods are available in the

16 marketplace for a lower price in certain retail locations, as opposed to Plaintiffs' authorized

17 retailers. Such injury is clearly not compensable by money damages. *See Gilliam v. American*

18 *Broadcasting Cos.*, 538 F.2d 14 (2d Cir. 1976) (explaining that because the irreparable injury that a

19 plaintiff suffers when a defendant abuses his reputation or goodwill is difficult to measure in

20 monetary terms, plaintiff is clearly entitled to injunctive relief to prevent any further violations).

21 Plaintiffs have been and will continue to be irreparably harmed by Defendants' infringing activities

22 if not enjoined immediately.

23        **C.      The Balance of Hardships Favors Plaintiffs**

24        "A plaintiff seeking a preliminary injunction must establish that the balance of equities tips

25 in [its] favor." *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1281 (C.D. Cal.

26 2008) (citing *Winter*, 129 S. Ct. at 374). "When considering the balance of equities, courts will not

27 shy away from issuing preliminary injunctive relief, 'where to do so would be to aid a second comer

28 who has sought to trade upon the efforts and good will of the first comer.'" *Id.* (citing *Helene Curtis*

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

13

1 | *Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir.1977)).

2       Here, the balance of equities tips in favor of Plaintiffs. As discussed above, the value of

3 Plaintiffs' Trademarks will be irreparably damaged by Defendants' unauthorized conduct unless

4 this Court enjoins such activity. Moreover, the issuance of the preliminary relief requested by

5 Plaintiffs will not cause any injury to third parties, because the genuine products at issue are readily

6 available from authorized sources. Finally, Defendants cannot be cognizably harmed if they are

7 ordered to cease infringing Plaintiffs' Trademarks, because Defendants would be enjoined only

8 from engaging in unlawful activities.

9       The threat of irreparable injury to Plaintiffs' rights in their trademarks causes the "balance of

10 hardships" to tip decidedly in Plaintiffs' favor. Potential monetary loss and other inconveniences to

11 a defendant do not weigh heavily against a potential threat to a trademark owner's intangible assets,

12 such as reputation and goodwill. The only hardship that Defendants face if this Court grants the

13 relief sought, and Defendants ultimately prove that their conduct is innocent, is lost profits. Any

14 such monetary loss can be remedied by the issuance of a bond. On the other hand, Plaintiffs have

15 spent considerable time, effort, energy, and resources developing their reputation for quality goods

16 distinctly identifiable by Plaintiffs' Trademarks, which are being irreparably harmed by

17 Defendants' inferior Counterfeit and/or Infringing Goods.

18       **D.**    <u>**An Injunction is in the Public Interest**</u>

19       "In the trademark context, courts often define the public interest at stake as the right of the

20 public not to be deceived or confused." *Cytosport*, 617 F. Supp. 2d at 1081. Here, the public has a

21 strong interest in being free not only from the confusion caused by Defendants' unauthorized use of

22 Plaintiffs' Trademarks, but also from the risk of buying inferior counterfeit handbags and

23 accessories under the belief that they are buying Plaintiffs' genuine luxury goods.

24   **V.**    <u>**DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND**</u><br><u>**PRELIMINARILY ENJOINED FROM DILUTING PLAINTIFFS' TRADEMARKS**</u>

25       Injunctive relief is available for trademark dilution if a plaintiff "can establish that (1) its

26 mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the

27 defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use

28 presents a likelihood of dilution of the distinctive value of the mark." *Perfumebay.com Inc. v. eBay,*

STUBBS ALDERTON & MARKLES, LLP<br>
1453 3RD ST. PROMENADE<br>
SUITE 300<br>
SANTA MONICA, CALIFORNIA 90401

14

1  *Inc.*, 506 F.3d 1165, 1180 (9th Cir. 2007) (internal citations and quotation marks omitted).

2  California's dilution cause of action is substantially similar to a federal claim for dilution under the

3  Lanham Act and is subject to the same analysis. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316,

4  1324 (9th Cir. 1998).

5      **A.**    **<u>Likelihood of Success on the Merits</u>**

6        A mark will be considered "famous" if it is widely recognized by the general consuming

7  public of the United States (for a federal dilution claim) or California (for a state dilution claim) as a

8  designation of source of the goods or services of the mark's owner. 15 U.S.C. § 1125(c)(2)(A); Cal.

9  Bus. & Prof. Code § 14247(a). Relevant factors in determining whether a mark is "famous" include:

10  (1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether

11  advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic

12  extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of

13  the mark; and (4) whether the mark was registered on the principal register (or in California for a

14  state dilution claim). *See* 15 U.S.C. § 1125(c)(2)(A); Cal. Bus. & Prof. Code § 14247(a)(1)-(4). As

15  set forth above, Plaintiffs own numerous federal trademark registrations for Plaintiffs' Trademarks,

16  many of which have become incontestable. Plaintiffs' Trademarks have all acquired distinctiveness

17  and fame through Plaintiffs' extensive advertising and sales of goods bearing the same. (Maltbie

18  Decl. ¶¶ 10, 25, 41.) Moreover, Plaintiffs have used Plaintiffs' Trademarks exclusively and have

19  consistently protected them from dilution and infringement. (*Id.*, ¶ 52.) Plaintiffs' continued

20  exclusive use and protection of Plaintiffs' Trademarks have led to strong recognition by the

21  consuming public. There is no doubt that Plaintiffs' Trademarks are famous.

22        Further, as indicated by the evidence submitted in connection with the Complaint and the

23  instant Application, Defendants have been making commercial use of Plaintiffs' Trademarks, and

24  appear to have started doing so well after those marks became famous. Defendants' unauthorized

25  use of Plaintiffs' Trademarks on handbags and accessories that are of inferior quality is likely to

26  cause dilution by tarnishment. "Tarnishment occurs when a defendant's use of a mark similar to a

27  plaintiff's [mark] presents a danger that consumers will form unfavorable associations with the

28  mark." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 881 (9th Cir. 1999). Tarnishment

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

15

1   "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is

2   portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the

3   owner's product." *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2nd Cir. 1994). The inferior

4   quality of Defendants' Infringing Goods presents a risk of diluting Plaintiffs' Trademarks by

5   tarnishment. (Maltbie Decl. ¶¶ 15, 30, 46.) Plaintiffs are thus likely to succeed on the merits of their

6   dilution claims.

7       **B.**      **Likelihood of Irreparable Harm & Balance of Hardships**

8       The Defendants' continued use of Plaintiffs' Trademarks in connection with counterfeit

9   products of inferior quality during the pendency of this litigation will undoubtedly cause Plaintiffs

10  to lose control over the goods bearing Plaintiffs' Trademarks, and the goodwill such marks

11  represent. This will cause Plaintiffs irreparable harm for which there is no adequate remedy at law.

12  In contrast, Defendants have no right to use the infringing and diluting Plaintiffs' Trademarks to sell

13  their Counterfeit and/or Infringing Goods. Any harm that Defendants may suffer as the result of an

14  injunction would be of their own making and not legally cognizable.

15      **C.**      **An Injunction is in the Public Interest**

16      In contrast to other trademark protection provisions, dilution focuses on protecting the

17  distinctiveness of the trademark rather than protecting consumers from confusion. *Mattel, Inc. v.*

18  *MCA Records, Inc.*, 296 F.3d 894, 905 (9th Cir. 2002). As such, with respect to Plaintiffs' dilution

19  by tarnishment claim, an injunction is in the public interests of protecting the integrity of the fame

20  and value of Plaintiffs' Trademarks.

21  **VI.    DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND
        PRELIMINARILY ENJOINED FROM INFRINGING PLAINTIFF LOUIS
22      VUITTON'S COPYRIGHTS**

23      **A.**      **Likelihood of Success on the Merits**

24      In order to succeed on a copyright infringement claim, a plaintiff must demonstrate: (1)

25  ownership of a valid copyright, and (2) that the alleged infringers violated at least one exclusive

26  right granted to copyright holders under 17 U.S.C. § 106. 17 U.S.C. § 501; *A&M Records, Inc. v.*

27  *Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Plaintiff Louis Vuitton has established the

28  existence of valid copyrights in the Louis Vuitton Monogram Multicolor prints as set forth in the

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

16

1  registrations, which constitute *prima facie* evidence of the validity of the copyrights and the facts

2  stated in the certificates. 17 U.S.C. § 410(c). Louis Vuitton is also the legal and beneficial owner of

3  the Louis Vuitton Copyrighted Prints pursuant to 17 U.S.C. § 501(b). In addition, Defendants have

4  violated Louis Vuitton's exclusive rights pursuant to Section 106 in that Defendants are distributing

5  and/or selling goods that bear imitations or substantially similar designs to the Louis Vuitton

6  Copyrighted Prints. (Buckner Decl. ¶ 13; Maltbie Decl. ¶ 11.) Defendants have violated Louis

7  Vuitton's exclusive rights under Section 106 of the Copyright Act, and thus infringed its copyrights.

8     **B.    Likelihood of Irreparable Harm**

9        Because Louis Vuitton's copyright claim involves the same products as Plaintiffs' trademark

10  claims, the analysis regarding likelihood of irreparable harm regarding Louis Vuitton's copyright

11  claim is the same as the analysis regarding Plaintiffs' trademark claims. For the Court's

12  convenience, Plaintiffs direct the Court to the discussion in Section IV.B above.

13     **C.    Balance of Hardships**

14        An injunction may not issue unless the balance of hardships tips sharply in favor of the

15  moving party. *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993). Here,

16  Louis Vuitton has demonstrated that the balance of hardship tips sharply in its favor. As Louis

17  Vuitton has shown that Defendants' Infringing Goods are blatantly infringing the Louis Vuitton

18  Copyrighted Prints, it is difficult to imagine how the Defendants could suffer any legitimate harm

19  from the issuance of an injunction. At most, Defendants' may lose some revenue from being

20  enjoined from selling the infringing goods, but "[w]here the only hardship that the defendant will

21  suffer is lost profits from an activity which has shown likely to be infringing, such an argument in

22  defense merits little equitable consideration . . . ." *Cadence Design Systems, Inc. v. Avant! Corp.*,

23  125 F.3d 824, 830 (9th Cir. 1997) (internal citation and quotation marks omitted).

24     **D.    An Injunction is in the Public Interest**

25        The public interest would also be served by temporarily and preliminarily enjoining

26  Defendants from selling goods infringing the Louis Vuitton's Copyrighted Prints. "[I]t is virtually

27  axiomatic that the public interest can only be served by upholding protections and correspondingly,

28  preventing misappropriation of skills, creative energies, and resources which are invested in the

17

MEMO OF POINTS AND AUTHORITIES ISO PLS.' *EX PARTE* APP'N RE TRO; SEIZURE ORDER; OSC RE PI; TRO RE ASSET FREEZE; AND EXPEDITED DISC.

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1   protected work." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir.

2   1983) (internal citation and quotation marks omitted).

3   **VII.   THE COURT SHOULD AUTHORIZE A SEIZURE OF DEFENDANTS'
           COUNTERFEIT GOODS AND RECORDS PERTAINING THERETO PURSUANT

4           TO 15 U.S.C. § 1116(d)(1)(A)**

5           Faced with "an 'epidemic' of commercial counterfeiting," Congress enacted the

6   Counterfeiting Act of 1984 to provide a meaningful remedy to victims of counterfeit trafficking. *See*

7   S. Rep. No. 98-526, 98th Cong., 2d Sess. 5 (1984), reprinted in U.S.C.C.A.N. 3627, 3631. The

8   Counterfeiting Act expressly permits a court to grant an *ex parte* seizure order in "[c]ivil actions

9   arising out of [the] use of counterfeit marks," including "goods…and records documenting the

10  manufacture, sale or receipt" of the counterfeit goods. 15 U.S.C. § 1116(d). The intent and purpose

11  of the *ex parte* seizure provisions are as follows:

12          The purpose of the *ex parte* seizure provision is to provide victims of
            trademark counterfeiting with a means of ensuring that the courts are able to

13          exercise their jurisdiction effectively in counterfeiting cases. Testimony
            before both the House and Senate Judiciary Committees established that many

14          of those who deal in counterfeits make it a practice to destroy or transfer
            counterfeit merchandise when a day in court is on the horizon. The *ex parte*

15          seizure procedure is intended to thwart this bad faith tactic, while ensuring
            ample procedural protection for persons against who such orders are issued.

16

17  Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong.

18  Rec. H12076, at 12080 (Oct. 10, 1984). Thus, the Counterfeiting Act explicitly provides for *ex*

19  *parte* seizure orders if the following procedural protections have been assured: (1) an order other

20  than an *ex parte* seizure order is not adequate to achieve the purposes of the Counterfeiting Act; (2)

21  the plaintiff has not publicized the requested seizure; (3) the plaintiff is likely to succeed in showing

22  that the defendant used a counterfeit mark in connection with the sale, offering for sale, or

23  distribution of goods or services; (4) an immediate and irreparable injury will occur if such seizure

24  is not ordered; (5) the matter will be located at the place identified in the application; (6) the harm to

25  the plaintiff in denying the application outweighs the harm to the legitimate interests of the

26  defendant; and (7) the defendant would destroy, move, hide, or otherwise make the counterfeit

27  goods and records regarding such goods inaccessible to the court if the plaintiff were to proceed on

28  notice to the defendant. 15 U.S.C. § 1116(d)(4)(B).

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

18

1    Here, Defendants are openly selling counterfeit handbags and accessories. Because similarly
2    situated defendants invariably ignore the judicial process and transfer bogus goods if given advance
3    notice, and because Defendants may have knowingly and intentionally engaged in a criminal act
4    (*see* 18 U.S.C. § 2320), Plaintiffs have every reason to believe that Defendants will destroy or hide
5    counterfeit goods and related records if given notice to produce such goods and records pursuant to
6    a court order. Plaintiffs have not publicized the requested seizure. (Keats Decl. ¶ 14.) Further, as set
7    forth in Plaintiffs' accompanying papers and proposed order, all papers in support of Plaintiffs'
8    Application are requested to be kept under seal by the Clerk of this Court pending the hearing
9    confirming the seizure order. Further, as set forth above, Plaintiffs are likely to succeed on their
10   claims for trademark counterfeiting, infringement, false designation of origin, and dilution by
11   showing that Defendants have used Plaintiffs' Trademarks without authorization in connection with
12   the advertising, distribution, offering for sale, and sale of counterfeit handbags and accessories.
13   Likewise as set forth above, Plaintiffs will suffer immediate and irreparable harm if the requested
14   seizure is not ordered. *See Tommy Hilfiger Licensing, Inc. v. Nautical Apparel, Inc.*, 924 F. Supp.
15   17, 24 (S.D.N.Y. 1996) (noting that the required showing of irreparable harm for a seizure order is
16   the same as the showing of irreparable harm for granting a temporary restraining order or
17   preliminary injunction). Defendants, on the other hand, will not suffer any legally cognizable harm
18   from the requested seizure. Defendants have no legitimate interest in these items. In contrast,
19   Plaintiffs have a paramount interest in protecting Plaintiffs' Trademarks.

20   As set forth in the Buckner and Maltbie Declarations, Plaintiffs' investigators conducted an
21   investigation of the Glamora retail store, where they purchased counterfeit handbags and
22   accessories, and Plaintiffs are informed and believe that Defendants are continuing to sell
23   counterfeit products out of Glamora. As such, it is apparent that the goods Plaintiffs request to be
24   seized will be at Glamora.

25   In addition to making the above showings, and as required under 15 U.S.C. § 1116(d)(2),
26   Plaintiffs have notified the United States Attorney in this judicial district of Plaintiffs' intent to file
27   in instant Application. (Keats Decl. ¶ 15, Ex. 7.) Based on the foregoing, all of the necessary
28   requirements for granting a seizure order have been met.

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

19

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

## VIII. DEFENDANTS' ASSETS SHOULD BE RESTRAINED PENDING A DETERMINATION OF LIABILITY AND DAMAGES

Under 15 U.S.C. § 1117, a Plaintiff in a trademark infringement action is entitled to recover an infringers' profits derived from the infringement. To preserve this remedy and to stop Defendants' continued unlawful activities, Plaintiffs seek an order restraining Defendants from transferring or concealing their assets and profits pending a determination of liability and damages in this action.

### A. Legal Authority to Issue an *Ex Parte* Temporary Restraining Order Freezing Defendants' Assets

The Lanham Act specifically vests this Court with the authority to "grant injunctions, according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark . . . ." 15 U.S.C. § 1116(a). A trademark owner's "rights" under the Lanham Act include not only the right to be free from unauthorized infringement, but also to recover a defendant's profits and damages as a result of such infringement. *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 558-59 (9th Cir. 1992). "A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995). The Ninth Circuit has specifically authorized a prejudgment asset freeze by preliminary injunction in a trademark counterfeiting case. *Reebok*, 970 F.2d at 559 ("Because the Lanham Act authorizes the district court to grant [plaintiff] an accounting of [defendant's] profits as a form of final equitable relief, the district court had inherent power to freeze [defendant's] assets in order to ensure the availability of that final relief."). In fact, a number of other courts have issued temporary asset restraining orders on an *ex parte* basis against counterfeiters to prevent the fraudulent transfer of assets by the same. (*See* Keats Decl. ¶ 13, Ex. 6.)

### B. The Asset Freeze Should Be Issued Without Notice

Civil Local Rule 65-1(b) and Federal Rule of Civil Procedure 65(b) generally require that a party moving for injunctive relief give notice of its motion to the opposing party. However, courts have specifically held that where advance notice of an asset freeze is likely to cause a party to

1  alienate the assets sought to be frozen, a temporary restraining order may be issued *ex parte*. *See*

2  *F.T. Int'l Ltd. v. Mason*, 2000 WL 1514881, at *3 (E.D. Pa. Oct. 11, 2000) (granting *ex parte* TRO

3  freezing defendants' bank accounts upon finding that advance notice would likely have caused the

4  defendants "to secrete or alienate funds to be frozen."). Moreover, courts have long recognized that

5  civil actions against pirates and counterfeiters – whose very business is built around the deliberate

6  misappropriation of rights and property belonging to others – present special challenges that justify

7  proceeding on an *ex parte* basis. *See, e.g.*, *Time Warner Enter. Co., L.P. v. Does Nos. 1-2*, 876 F.

8  Supp. 407, 410-11 (E.D.N.Y. 1994). Here, because of Defendants' sophisticated operations in

9  selling their Counterfeit and/or Infringing Goods for large sums of money, Defendants' refusal to

10  surrender goods when asked to cease selling the Counterfeit and/or Infringing Goods, and

11  Barrameda's international ties, Plaintiffs reasonably believe that Defendants will abscond with or

12  fraudulently transfer their illegally obtained profits if given the notice and opportunity to do so.

13      **C.**    **Plaintiffs Meet the Standard for a Temporary Asset Restraining Order**

14      As set forth above, Plaintiffs have demonstrated that they are likely to succeed on the merits

15  of their claims alleged in the Complaint. Thus, Plaintiffs will not discuss that factor in great detail

16  here. The remaining factors are addressed in turn below.

17          1.    Plaintiffs Will Suffer Irreparable Harm if an Asset Freeze is Not Ordered

18      Plaintiffs submit that they will be irreparably harmed if the injunction freezing Defendants'

19  financial accounts and assets is not issued. A "party seeking an asset freeze must show a likelihood

20  of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not

21  granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). To do so, "[c]ourts in our

22  circuit have also looked to whether defendants have a particular capability or convenience in

23  secreting assets." *Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.*, 2013 WL

24  3622016, at *3 (N.D. Cal. July 12, 2013).  Here, Defendant Barrameda has publicized her claim that

25  she is a member or descendant of a Filipino royal family. (Keats Decl. ¶ 11; Ex.4.) Further,

26  Plaintiffs understand that Barrameda also recently purchased a large amount of penny stock in

27  Cannabis Sativa and her total ownership thereof is valued at $3,675,416. (*Id.*, ¶ 12; Ex. 5.) Thus,

28  considering Barrameda's sophistication, her ties to the Philippines, and her apparent ability to tap

21

MEMO OF POINTS AND AUTHORITIES ISO PLS.' *EX PARTE* APP'N RE TRO; SEIZURE ORDER;
OSC RE PI; TRO RE ASSET FREEZE; AND EXPEDITED DISC.

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1  large amounts of money in cannabis, there is a strong likelihood that Defendants' assets can be

2  dissipated once a restraining order is issued because, like most counterfeiters, the documentation

3  and monetary proceeds are difficult to locate once the counterfeiters know they are being

4  prosecuted. (*Id.*, ¶ 13.)

5       Should Defendants succeed, Plaintiffs face a real and substantial risk that these assets would

6  be beyond the jurisdiction of this Court, and that Plaintiffs' equitable remedy of disgorgement will

7  be irrevocably lost. Defendants are conducting an illegal enterprise that is built around deliberately

8  violating federal laws. Federal courts have long recognized that in counterfeiting cases such as this,

9  an asset freeze is frequently the only effective means to stop a defendant's continuing violations and

10 to provide some form of relief to the victim of those violations. *See U.S. ex rel. Vuitton S.A. v.*

11 *Karent Bag, Inc.*, 592 F. Supp. 734, 743, fn.4 (S.D.N.Y. 1984), *aff'd*, 780 F.2d 179 (2nd Cir. 1985),

12 *rev'd on other grounds*, 481 U.S. 787 (1987).

13          2.     The Balance of Hardships Favors Plaintiffs

14      Plaintiffs seek to restrain Defendants from dissipating their funds and assets pending an

15 evidentiary hearing or further action by the Court to determine whether the asset freeze shall remain

16 in effect pending the trial in this action. The handbags and accessories acquired by Plaintiffs and

17 their investigators from Defendants have been confirmed to be counterfeit. (Maltbie Decl. ¶¶ 14, 29,

18 45.) Thus, there is no legitimate harm to Defendants as a result of an injunction related to the

19 proceeds from the distribution of counterfeit materials. Thus, the impact of this temporary freeze is

20 minimal, particularly when compared to the harm to Plaintiffs, and it will preserve the *status quo* by

21 preventing Defendants from secreting, encumbering, or transferring assets beyond the Court's

22 jurisdiction. *See DSC Comms. Corp. v. DGI Techs., Inc.*, 898 F. Supp. 1183, 1189 (N.D. Tex. 1995)

23 ("[I]f the correct standard for balancing the hardships were whether the infringer would be forced

24 out of business, then a knowing infringer could construct its business around an infringing product

25 and effectively prevent the legitimate [rights] holder from obtaining relief or enforcing its rights.").

26 If it is determined that freezing all of Defendants' financial accounts would be too big a hardship on

27 Defendants, the Court's order issuing the asset freeze can mitigate the hardship by providing for

28 withdrawal of living expenses or for the payment of expenses related to legitimate business

STUBBS ALDERTON & MARKLES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

1   operations. If the Defendants comply with the order and submit the necessary proof to the Court,

2   then no undue hardship need be felt by the Defendants as a result of an asset freeze order. *See*

3   *Reebok*, 970 F.2d at 563.

4                       3.      <u>The Public Interest Will Be Served by Granting an Asset Freeze</u>

5           "In the trademark context, courts often define the public interest at stake as the right of the

6   public not to be deceived or confused." *Cytosport,* 617 F. Supp. 2d at 1081. Here, the public has a

7   strong interest in being free not only from the confusion caused by Defendants' unauthorized goods

8   bearing Plaintiffs' Intellectual Property, but also from the risk of being defrauded into purchasing

9   inferior goods at high prices under the mistaken belief they are buying Plaintiffs' genuine luxury

10  goods. A restraining order freezing the Defendants' assets, which will halt the reinvestment in and

11  the continued distribution of Defendants' Infringing Goods, serves the public interest.

12          For all of the forgoing reasons, Plaintiffs respectfully submit that the Court should issue a

13  temporary restraining order freezing Defendants' assets, including Barrameda's penny stock in

14  Cannabis Sativa, any property associated with the Defendants, and any financial accounts linked to

15  Defendants, associated with or receiving deposits of sales from Glamora, which has sold and/or

16  offered for sale Counterfeit and/or Infringing Goods. (Keats Decl. ¶¶ 12-13; Ex. 5.)

17  **IX.**    **LIMITED EXPEDITED DISCOVERY IS WARRANTED**

18          Expedited discovery is specifically contemplated by the Counterfeiting Act, which provides

19  that "[i]n connection with a [seizure order] hearing . . . the court may make such orders modifying

20  the time limits for discovery under the Rules of Civil Procedure as may be necessary to prevent the

21  frustration of the purposes of such hearing." 15 U.S.C. § 1116(d)(10)(B). Courts have adopted a

22  good cause standard for granting expedited discovery. *Semitool, Inc. v. Tokyo Electron Am., Inc.,*

23  208 F.R.D. 273, 275-76 (N.D. Cal. 2002). "Expedited discovery should be granted when some

24  unusual circumstances or conditions exist that would likely prejudice the party if he were required

25  to wait the normal time. Such prejudice is frequently the case where a well-known trademark . . .

26  has been counterfeited and the sources or purchasers of the counterfeit products are unknown to

27  plaintiff." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248,

28  250 (S.D. Fla. 1982) (internal citation omitted).

STUBBS ALDERTON & MARKILES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401

23

MEMO OF POINTS AND AUTHORITIES ISO PLS.' *EX PARTE* APP'N RE TRO; SEIZURE ORDER;
OSC RE PI; TRO RE ASSET FREEZE; AND EXPEDITED DISC.

1    As described throughout the instant Application, Plaintiffs allege direct infringement by

2  Defendants' sale of unauthorized Counterfeit and/or Infringing Goods bearing Plaintiffs'

3  Intellectual Property. In light of the apparent intentional infringement of Plaintiffs' rights, there is a

4  legitimate risk that physical evidence may be destroyed in the face of a pending injunction. As such,

5  there is good cause to allow for expedited discovery so that Plaintiffs may have the opportunity to

6  identify additional defendants who are trading or assisting Defendants in misappropriating

7  Plaintiffs' Intellectual Property and selling the Counterfeit and/or Infringing Goods.

8  **X.   BOND**

9    The Ninth Circuit has "recognized Rule 65(c) invests the district court with discretion as to

10  the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)

11  (internal citation and quotation marks omitted). "The district court may [therefore] dispense with

12  the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from

13  enjoining his or her conduct." *Id.*

14    Plaintiffs submit that any bond required by the Court should be minimal (if any) given the

15  counterfeit goods at issue, and the fact that Defendants' legitimate business (if any) will be

16  minimally affected (if at all) by the Orders sought herein.  Accordingly, Plaintiffs respectfully

17  submit that a bond of not more than $10,000 is sufficient, and request leave of Court to file proof of

18  the bond in the amount set by the Court within three court days of the Court's Order.

19  **XI.   CONCLUSION**

20    For the foregoing reasons, Plaintiffs respectfully request that the Court grant their

21  application for (1) Temporary Restraining Order, (2) Seizure Order, (3) Order to Show Cause Re

22  Preliminary Injunction, (4) Temporary Restraining Order to Freeze Defendants' Assets Pending a

23  Determination of Liability and Damages; and (5) Expedited Discovery.

Dated: December 10, 2014         STUBBS ALDERTON & MARKILES, LLP

24

25                                         By: _____

26                                         Anthony M. Keats
                                           Konrad K. Gatien
27                                         Vivian S. Lee
                                           Attorneys for Plaintiffs
28                                         LOUIS VUITTON MALLETIER, S.A.,
                                           CÉLINE, S.A., and CHRISTIAN DIOR, S.A.

STUBBS ALDERTON & MARKILES, LLP
1453 3RD ST. PROMENADE
SUITE 300
SANTA MONICA, CALIFORNIA 90401