United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LOUIS VUITTON MALLETIER, S.A., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GLAMORA BY SADIA, et al.,<br><br>Defendants. | Case No.  14-cv-05421-BLF<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION; AND DISSOLVING TEMPORARY RESTRAINING ORDER**<br><br>[Re: ECF 76, 82] |

Plaintiffs seek a preliminary injunction freezing Defendants' assets pending a determination of liability and damages in this case. The Court has considered the briefing, the applicable legal authorities, and the oral argument presented at the hearing on November 12, 2015. For the reasons discussed below, the motion for a preliminary injunction is DENIED and the temporary restraining order issued on October 26, 2015 is DISSOLVED.

**I.   BACKGROUND**

Plaintiffs Louis Vuitton Malletier, S.A., Celine, S.A., and Christian Dior, S.A. are French fashion companies that manufacture and distribute luxury goods such as apparel, handbags, and other accessories. Plaintiffs filed this action on December 12, 2014, alleging that Defendant Sadia Barrameda ("Barrameda"), individually and doing business as Glamora By Sadia ("Glamora"), sells counterfeit purses and other goods that are represented to be manufactured by Plaintiffs. Compl., ECF 1. The complaint alleged federal trademark and copyright claims and related state law claims. *Id.*

In conjunction with filing the complaint, Plaintiffs filed an ex parte application seeking: (1) a temporary restraining order ("TRO") enjoining Barrameda and Glamora from infringing or diluting Plaintiffs' trademarks and copyrights; (2) a seizure order for the impound of all unauthorized merchandise or packaging bearing Plaintiffs' trademarks or copyrights, the means for making same, and records regarding such merchandise; (3) a TRO freezing the assets of Barrameda and Glamora; (4) an order to show cause ("OSC") why a preliminary injunction should not issue extending any TRO throughout the pendency of this lawsuit; and (5) expedited discovery. Pls.' Ex Parte Applic., ECF 5. On December 16, 2014, the Honorable Samuel Conti, then assigned to the case, granted all relief requested by Plaintiffs except the asset freeze. Order Granting Ex Parte Motions, ECF 17. Judge Conti concluded that Plaintiffs had failed to present facts showing a likelihood of dissipation of assets, noting among other things that Barrameda's Filipino heritage did not automatically make her likely to flee the country and that she almost certainly had some assets in California that would be difficult to hide or dissipate. *Id.*

Pursuant to Judge Conti's seizure order, numerous handbags, wallets, and accessories bearing counterfeits of Plaintiffs' trademarks and designs were seized from Glamora. Revised Keats Decl. ¶ 6, ECF 88-1; Barrameda Decl. ¶ 9, ECF 84-6.[1] The Glamora store closed its doors in December 2014 shortly after the seizure. Barrameda Decl. ¶ 9.

In January 2015, the parties stipulated to entry of a preliminary injunction enjoining Barrameda and Glamora from infringing or diluting Plaintiffs' trademarks and copyrights. Stipulation, ECF 22. Judge Conti issued an order approving that stipulation on January 9, 2015. Order Re Stipulation Re Preliminary Injunction and Expedited Discovery, ECF 23.

On March 24, 2015, Plaintiffs filed the operative first amended complaint ("FAC"), adding Defendant New Compendium Corporation ("NCC"), a corporation allegedly wholly owned and controlled by Barrameda, used to pay expenses of Barrameda and Glamora, and used to facilitate the sales of counterfeit goods. FAC, ECF 35.

On October 26, 2015, Plaintiffs again sought a TRO freezing Defendants' assets and an

---

[1] Barrameda's declaration has been sealed in part. This order makes specific references only to the unsealed portions of the declaration.

2

OSC re preliminary injunction. Pls.' Ex Parte Applic., ECF 62. Based upon Plaintiffs' showing in that application, Judge Conti issued the requested TRO and OSC without notice to Defendants. TRO Freezing Defendants' Real Property and Financial Accounts and Assets and OSC Re: Preliminary Injunction, ECF 76. A few days later, the case was transferred to the undersigned judge. Order Reassigning Case, ECF 78.

This Court extended the TRO issued by Judge Conti for an additional fourteen days and set a hearing on the OSC re preliminary injunction for November 12, 2015. Order Extending TRO and Setting Hearing on OSC re Preliminary Injunction, ECF 82. The Court also approved the parties' stipulation to modify the TRO to permit Barrameda to expend funds sufficient to pay ordinary monthly living expenses and to permit NCC to expend funds sufficient to pay ordinary monthly business expenses. Stipulation and Order to Modify TRO, ECF 81.

Some irregularities occurred during the briefing of this matter. First, although the Court ordered that opposition to Plaintiffs' application for injunctive relief be filed on or before November 4, 2015, NCC did not file opposition until November 6, 2015.[2] The Court has been informed that NCC contacted Court staff on November 4, 2015 about a technical problem regarding upload of NCC's opposition, but the problem was not resolved until November 6, 2015. Plaintiffs have not objected to NCC's late filing. The Court in the exercise of its discretion has considered NCC's late-filed opposition.

Second, on November 10, 2015, Plaintiffs filed both a reply brief and a Notice of Errata purporting to correct "ministerial" errors in the TRO application that was filed on October 26, 2015. Pls.' Notice of Errata, ECF 88-89. The Notice of Errata is accompanied by revised versions of the TRO application, supporting declaration, and exhibits. On November 11, 2015, Defendants filed an objection to the Notice of Errata, pointing out that the revisions to the TRO application encompass not only clerical corrections but also substantive additions to the supporting declaration of Plaintiffs' counsel and a new exhibit that was not included in Plaintiffs' original

---

[2] Barrameda and Glamora submitted their opposition on November 4, 2015 in conjunction with an administrative motion to seal portions of the opposition brief and supporting declaration of Barrameda. Glamora and Barrameda Opp., ECF 84. The sealing motion and a related motion to remove inadvertently filed documents have been granted in separately filed orders.

3

1  filing.  Defs.' Objection to Plaintiffs' Notice of Errata, ECF 93.  Defendants also filed an objection
2  to evidence submitted by Plaintiffs in support of the reply.  Defs.' Objection to Plaintiffs' Reply
3  Evidence, ECF 92.  Those objections are addressed below in section III.A.

## II.  LEGAL STANDARD

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.  When making a showing of irreparable harm, "[a] party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).

## III.  DISCUSSION

### A.  Evidentiary Objections

Both sides have made a number of evidentiary objections, addressed as follows.

#### 1.  Defendants' Evidentiary Objections

##### a.  Objections Raised in Opposition

The opposition filed by Barrameda and Glamora contains several objections which, unfortunately, are not called out as such but rather are tossed into the argument almost in passing.  *See* Defs.' Opp. at 3, 10, ECF 84-5.  The objections refer only to Plaintiffs' moving *brief*, not to any documentary evidence that Plaintiffs have submitted to the Court.  *Id.*  Defendants appear to be under the mistaken impression that the Court will scour the referenced portions of Plaintiffs' brief to determine what evidence is cited therein that Defendants might find objectionable.  The objections are OVERRULED.  *See Gunther v. Xerox Corp.*, No. 13-cv-04596-HSG, 2015 WL 5769619, at *1 (N.D. Cal. Oct. 2, 2015) (overruling objections to opposing party's "*brief* as opposed to the specific evidence").

4

### b. Objections to Reply Evidence

Defendants do raise specific objections to Plaintiffs' reply evidence, which are SUSTAINED. *See* Defs.' Objections to Plaintiffs' Reply Evidence, ECF 92. Plaintiffs' counsel states in his reply declaration that Exhibit 2 comprises notebook pages in Barrameda's handwriting but he provides no foundation for that statement. *See* Keats Reply Decl. ¶ 5 and Exh. 2, ECF 91. Counsel's statement that Defendants' insurance policy does not cover trademark infringement claims is a legal conclusion. *See* Keats Reply Decl. ¶ 7, ECF 91.

### c. Objections to Notice of Errata

Plaintiffs' Notice of Errata was submitted on Tuesday, November 10, 2015. Because the following day, November 11, was a holiday, the Court did not receive courtesy copies of the revised documents (comprising more than 600 pages) prior to the hearing on November 12, 2015. Thus it has taken the Court several days *after* the hearing to become familiar with the relevant evidence, which is contrary to the Court's practice of preparing fully before oral argument. Plaintiffs' conduct placed Defendants at a significant disadvantage by depriving Defendants of an opportunity to respond substantively to Plaintiffs' submission. At the hearing, the Court offered Defendants additional time to review the documents, but conditioned that offer on an agreement to extend the TRO beyond the statutory limit. Defendants declined.

Given these circumstances, the Court ordinarily would be inclined to strike the Notice of Errata in its entirety. In this instance, however, the Notice of Errata primarily corrects the mistaken identification of previously submitted documents. Insofar as those documents are well-known to Defendants and, in fact, derive from their records, there is no real prejudice. As to the newly submitted evidence, it is stricken. Accordingly, Defendants' general objection to the Notice of Errata is SUSTAINED IN PART and OVERRULED IN PART. In light of that ruling, Defendants' specific objections to new material submitted with the Notice of Errata – in particular new paragraph 9 of counsel's revised declaration and new Exhibit 32 – are moot.

### 2. Plaintiffs' Evidentiary Objections

In their reply, Plaintiffs assert numerous objections to portions of Defendants' *opposition brief*. *See* Pls.' Reply at 12-14, ECF 90. Plaintiffs do not identify the evidence to which they

object. The Court will not scour Defendants' brief to discover what evidence is cited therein that Plaintiffs may find objectionable. The objections are OVERRULED. *See Gunther v. Xerox Corp.*, No. 13-cv-04596-HSG, 2015 WL 5769619, at *1 (N.D. Cal. Oct. 2, 2015) (overruling objections to opposing party's "*brief* as opposed to the specific evidence").

Plaintiffs do identify one piece of evidence to which they object – Exhibit 2 to Barrameda's declaration. That document is represented to be "Glamora's sales summary." Barrameda Decl. ¶ 10. As Plaintiffs point out, however, the document is hearsay and Barrameda does not indicate that it was prepared in the ordinary course of business so as to fall within the business records exception. *See* Fed. R. Evid. 801(c) (defining hearsay); Fed. R. Evid. 803(6) (defining business records exception). A district court may give even hearsay statements some weight in deciding whether to issue a preliminary injunction when doing so would serve the purpose of preventing irreparable harm. *See Johnson*, 572 F.3d at 1083. Barrameda has not demonstrated that consideration of the hearsay "Glamora sales summary" is necessary to prevent irreparable harm here. Accordingly, Plaintiffs' objection to Exhibit 2 to Barrameda's declaration is SUSTAINED.

**B.     Analysis**

Having disposed of the above procedural issues, the Court turns to the substance of Plaintiffs' motion for a preliminary injunction. The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1092 (N.D. Cal. 2012). Judge Conti determined that Plaintiffs were entitled to an asset freeze under that standard when he issued the TRO. However, Defendants had not yet had an opportunity to submit argument or evidence. This Court must determine whether a preliminary injunction is warranted based upon the fuller record now before it.

As an initial matter the Court notes that "Rule 65 of the Federal Rules of Civil Procedure governs the *procedure* for the issuance of a preliminary injunction: the *authority* for the injunction . . . must arise (if at all) elsewhere." *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970

6

F.2d 552, 558 (9th Cir. 1992). The Supreme Court has held that a preliminary injunction may not issue to prevent the dissipation of assets pending an adjudication of a claim for legal damages. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999). The Supreme Court's ruling was grounded in "the historical principle that before judgment (or its equivalent) an unsecured creditor has no rights at law or in equity in the property of his debtor." *Id.* at 330. "However, by its very terms, the holding of *Grupo Mexicano* is limited to cases in which only monetary damages are sought." *Johnson*, 572 F.3d at 1083. The holding does not bar the issuance of an asset freeze when the plaintiff seeks both legal and equitable remedies. *Takaguchi v. MRI Int'l, Inc.*, 611 Fed. Appx. 919, 921 (9th Cir. 2015).

The Ninth Circuit has held that where, as here, a plaintiff brings trademark claims under the Lanham Act, the district court has "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief" under the Act. *Reebok*, 970 F.2d at 559. Under the Lanham Act, a district court has authority to grant the plaintiff an accounting of the defendant's profits as a form of final equitable relief. *Id.* Thus in *Reebok* the Ninth Circuit held that the district court had acted within its discretion in issuing an asset freeze that "was designed to preserve the possibility of an effective accounting of [the defendant's] profits and the return of profits fraudulently obtained." *Id.* at 560.

Under *Reebok*, this Court clearly has authority to freeze Defendants' assets to the extent necessary to preserve the possibility of an effective accounting of Defendants' profits from the alleged Lanham Act violations and the return of profits fraudulently obtained. Having satisfied itself that it has the authority to issue a preliminary injunction under Rule 65, the Court must evaluate whether Plaintiffs have established an entitlement to that extraordinary remedy under the *Winters* factors.

### 1.   Likelihood of Success on the Merits

The Court has no difficulty in concluding that Plaintiffs have demonstrated a likelihood of success on the merits of their Lanham Act claims against Barrameda and Glamora. Judge Conti's first TRO order, enjoining Barrameda and Glamora from infringing or diluting Plaintiffs' trademarks and copyrights, describes investigators' purchases of counterfeit merchandise at

7

Barrameda's store, Glamora, on several occasions. Order Granting Ex Parte Motions, ECF 17. Plaintiffs' investigation and purchase of counterfeit merchandise also is described in the declaration of John Maltbie, Director of Intellectual Property, Civil Enforcement, for Louis Vuitton North America, Inc., which was submitted to Judge Conti at the time Plaintiffs initially sought a TRO. *See* Maltbie Decl. ¶¶ 12-51, ECF 8. Pursuant to Judge Conti's seizure order, numerous handbags, wallets, and accessories bearing counterfeits of Plaintiffs' trademarks and designs were seized from Glamora. Revised Keats Decl. ¶ 6, ECF 88-1. In addition, shop bags, cloth dust covers, and care instructions and authentication cards bore counterfeits of Plaintiffs' marks. *Id.*

Plaintiffs' showing of likelihood of success is less compelling with respect to NCC, which was not a defendant at the time Judge Conti issued the first TRO in this action. Plaintiffs added NCC when they filed the FAC in March 2015, alleging that "Barrameda has been the sole officer, director and stockholder of NCC since 2007, and exercises control thereof, and has used funds originating from NCC's accounts to pay Defendant Glamora and Defendant Barrameda's expenses and to facilitate Defendant Glamora and Defendant Barrameda's infringing activities complained of herein." FAC ¶ 11, ECF 35. Plaintiffs thus appear to be asserting liability against NCC under an alter ego theory, although the FAC does not actually use the phrase "alter ego."

Much of Plaintiffs' evidence regarding alter ego is inadequate or inadmissible. For example, Plaintiffs' counsel states in paragraph 8 of his revised declaration that that NCC "allegedly made loans to Glamora, though it simply was Barrameda acting in alter ego." Revised Keats Decl. ¶ 8, ECF 88-1. Paragraph 8 does not provide any factual basis for the legal conclusion that NCC is Barrameda's alter ego. Paragraph 9 of counsel's revised declaration contains several assertions regarding NCC's role as "the main company among the various companies," and "the primary source of money" for Barrameda and Glamora, and purports to support those statements with a cash flow chart spanning several pages and a lengthy exhibit constituting photocopies of cancelled checks. *See* Revised Keats Decl. ¶ 9 and Exh. 32. As discussed in section III.A. above, the Court has sustained Defendants' evidentiary objections to paragraph 9 and the exhibit in question. Plaintiffs do present evidence that Barrameda withdrew $991,640.69 in cash from an

NCC account and that shortly thereafter she paid almost that exact amount of cash for her home. *See* Revised Keats Decl. ¶ 12 and Exhs. 4-5. That evidence does give rise to an inference that Barrameda uses NCC as her personal piggy bank. Thus although Plaintiffs' evidence of alter ego is not robust, the Court concludes that Plaintiffs have shown some likelihood of success on the merits against NCC on an alter ego theory of liability.

### 2. Likelihood of Irreparable Harm

In order to obtain a preliminary injunction freezing Defendants' assets, Plaintiffs "must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson*, 572 F.3d at 1085. The Ninth Circuit has taken pains to make clear that a *possibility* of dissipation will not suffice – a showing of *likelihood* of dissipation is required. *Id.* at 1085 n.11.

Plaintiffs have not made such a showing here. Plaintiffs point to the fact that Barrameda placed her home on the market for $1,200,000[3] after the start of this litigation. *See* Revised Keats Decl. ¶ 16 and Exh. 9. The timing of Barrameda's decision to list her home is somewhat suspicious. However, there is no evidence that Barrameda made any attempt to conceal the listing of her home or that she intended to hide the sale proceeds. Barrameda states in her declaration that she listed her home for sale because she wished to relocate to an area with better schooling options for her son. Barrameda Decl. ¶ 19, ECF 84-6. Plaintiffs speculate that Barrameda would move the proceeds from the sale of her home overseas. *See* Revised TRO Applic. at 12, ECF 88-1. However, that speculation is without factual support.

Plaintiffs present evidence that Barrameda took out an equity loan on her home in the amount of $625,000 in March 2015. Revised Keats Decl. ¶ 14 and Exh. 7, ECF 88-1. Plaintiffs assert that they do not know where that money went and therefore that Barrameda has dramatically dissipated the value of her home. Barrameda acknowledges the home equity loan and states in her declaration that she loaned $575,000 of the loan proceeds to a public company in

---

[3] While Plaintiffs assert that the home was listed for "$1,200,000," the evidence indicates that it was listed for $1,299,700, almost $100,000 more than the figure Plaintiffs use in their briefing. *See* Revised Keats Decl. Exh. 9.

which she holds shares, in exchange for a promissory note. Barrameda Decl. ¶ 20, ECF 84-6. Plaintiffs assert that in making that loan Barrameda put the $575,000 in question out of their reach. The Court finds that the loan could be viewed as evidence of possible dissipation of assets insofar as the ready ability to liquidate the equity is impaired.

Plaintiffs assert that Barrameda has caused to be created "a British privately-held company in the name of New Compendium Corp., Ltd. obviously for the purpose of transferring and holding assets from her Colorado corporation of the same name." *See id.* While Plaintiffs do present evidence that Barrameda incorporated a private limited company called New Compendium Corporation Ltd. in England on April 16, 2015, *see* Revised Keats Decl. ¶ 8, they present no evidence whatsoever to support a conclusion that Barrameda did so for the purpose of transferring NCC's assets to the new company. Barrameda explains in her declaration that she formed New Compendium Corporation Ltd. in England to access trading on European markets. Barrameda Decl. ¶ 16, ECF 84-6. She declares that she has invested a total of $100 to form the entity, that it does not have any bank accounts or brokerage accounts, and that it is totally separate from NCC. *Id.* Barrameda states that after forming New Compendium Corporation Ltd. in England, she has continued to operate NCC as always, that she could not transfer NCC's holdings to the English company without actually selling NCC's assets for valid consideration, and that in fact many of NCC's investments are restricted such that the shares may be sold only after the restrictions expire. *Id.* Plaintiffs have not presented any evidence to dispute Barrameda's declaration statements on these points.

Plaintiffs contend that Barrameda "has also been transferring increments of $10,000 to China for the last several years thereby possibly bypassing bank reporting requirements." Revised TRO Applic. at 12, ECF 88-1. In support of that contention, Plaintiffs cite to their counsel's declaration statement that "beginning no later than October 2013, and continuing through the present, Defendant Barrameda has been withdrawing substantial funds from her NCC Account at Bank of America, often in the amount of $10,000, and was repeatedly sending those funds overseas, and in particular, China." Revised Keats Decl. ¶ 13. However, the bank records relied upon by Plaintiffs' counsel in making that assertion show that the last significant transfer to China

occurred on November 24, 2014, *before* this action was filed on December 12, 2014. Revised Keats Decl. ¶ 13 and Exh. 6. The proffered records show a single transfer to China, in the amount of $1,000, after the commencement of this action. *Id.* Barrameda explains in her declaration that while Glamora was open she purchased merchandise from China for resale at Glamora. Barrameda Decl. ¶ 6, ECF 84-6. As noted, Plaintiffs' evidence shows only a single $1,000 transaction following the closure of Glamora in December 2014.

Plaintiffs make much of the fact that Barrameda and NCC trade in penny stocks. Barrameda makes no secret of the fact that she considers her primary occupation to be stock trading. *See* Barrameda Decl. ¶ 13, ECF 84-6. She states that she has been investing in public companies for more than ten years, most of them traded on United States markets, and that her investments generate most of her income. *Id.* ¶¶ 13, 17. The Court is at a loss to understand how those trading activities would support a finding that Barrameda is likely to hide or dissipate assets. The Court notes that Judge Conti also was puzzled by this argument when it was presented to him. In denying Plaintiffs' first request for an asset freeze, Judge Conti stated: "Nor does the Court understand why her ownership of penny stocks makes it easier for her to secret assets. Indeed, Plaintiffs found out about Ms. Barrameda's stock holdings through a public SEC filing. Presumably, the public nature of her holdings will actually make it more difficult to hide those assets." Order Granting Ex Parte Motions at 15, ECF 17 (citations omitted).

Plaintiffs also reference transactions in which an entity called Alpine Securities Corporation ("Alpine") transferred more than $8,000,000 to NCC. *See* Revised Keats Decl. Exh. 31. Plaintiffs do not explain the significance of those transactions. Barrameda explains in her declaration that Alpine is a registered securities brokerage and clearing firm that handles her trading, and that she has never had an ownership interest in Alpine. Barrameda Decl. ¶ 13, ECF 84-6.

After considering all of the admissible evidence, with particular attention to the evidence regarding Barrameda's listing of her home and home equity loan, the Court concludes that Plaintiffs have not established a *likelihood* that Defendants will dissipate or hide assets absent the requested preliminary injunctive relief.

### 3. Balance of Equities

As noted above, Barrameda's primary source of income is stock trading. She states in her declaration that since issuance of the TRO freezing her assets, she has been prevented from making profitable stock trades. Barrameda Decl. ¶ 26, ECF 84-6. Plaintiffs point out that the TRO has been modified to permit Barrameda and NCC to pay ordinary monthly expenses, but Plaintiffs do not dispute Barrameda's statement regarding the impact of the asset freeze on her ability to trade stocks. An extension of the asset freeze clearly would have a significant adverse impact upon Barrameda.

In contrast, because Plaintiffs have not shown a likelihood that Defendants are likely to dissipate or hide assets, Plaintiffs have not demonstrated that they will be harmed if the asset freeze is dissolved. Accordingly, the balance of equities tips sharply against issuance of the requested injunction.

### 4. Public Interest

The public interest factor is not particularly relevant here. Plaintiffs cite authorities for the proposition that in trademark cases the public has the right "not to be deceived or confused." *CytoSport, Inc. v. Vital Pharmaceuticals, Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009). However, the present motion does not seek an injunction prohibiting Defendants from continuing to sell counterfeit goods – that injunction already is in place. The issue before the Court at this time is whether Defendants' assets should remain frozen throughout the litigation. Plaintiffs have not cited, and the Court has not discovered, any cases indicating that the public would have an interest in that determination.

### C. Conclusion

Having considered the parties' arguments, the admissible evidence, and the relevant legal authorities, the Court concludes that Plaintiffs have failed to demonstrate an entitlement to a preliminary injunction freezing Defendants' assets. Plaintiffs have failed to show a likelihood that Defendants will dissipate or hide assets absent the requested relief, and the balance of hardships

tips sharply against the requested asset freeze.[4]

**IV.  ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Plaintiffs' motion for a preliminary injunction freezing Defendants' assets is DENIED; and

(2) The TRO issued on October 26, 2015 is DISSOLVED.

Dated: November 20, 2015

_____
BETH LABSON FREEMAN
United States District Judge

---

[4] In light of the Court's conclusion that Plaintiffs are not entitled to an asset freeze, the Court need not address the parties' disputes regarding the amount of profits resulting from sales of counterfeit goods and whether an insurance policy held by Barrameda would provide adequate coverage if Defendants were found liable.  Those issues would be relevant if the Court were inclined to grant an asset freeze and were attempting to determine the appropriate scope of such freeze.

13